IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| PERVIS LEE ANDREWS JR., | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-547-O |
| | § | |
| BOBBY LUMPKIN, Director, TDCJ-CID, | § | |
| Respondent. | § | |

**<u>OPINION AND ORDER</u>**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Pervis Lee Andrews Jr., a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ-CID), against Bobby Lumpkin, the director of that division, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

**I. BACKGROUND**

Petitioner was indicted in Tarrant County, Texas, Case No. 1436114D, on one count of murder and one count of aggravated assault with a deadly weapon stemming from an altercation between Petitioner and the victim during which Petitioner stabbed the victim with a knife. The indictment also included a habitual-offender notice alleging prior felony convictions for burglary of a vehicle and burglary of a habitation. Clerk's R. 6, ECF No. 10-10. In February 2017 a jury found Petitioner guilty of the lesser offense of aggravated assault with a deadly weapon, found the habitual-offender notice true, and assessed his punishment at life imprisonment. *Id.* at 113. Petitioner's conviction was affirmed on appeal and the Texas Court of Criminal Appeals refused his petition for discretionary review. Docket Sheet 2, ECF No. 10-2. Petitioner also filed a state habeas-corpus

application challenging his conviction and sentence, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court and its own independent review of the record. Action Taken, ECF No. 10-20. This federal petition followed.

## II.  ISSUES

In two grounds for habeas relief, Petitioner claims that his conviction and sentence were obtained in violation of his right to effective assistance of counsel because his trial counsel, Scottie Allen, failed to present evidence of his mental health issues as mitigation in both the guilt/innocence and punishment phases of his trial. Pet. 6–9, ECF No. 1.[1]

## III.  RULE 5 STATEMENT

Respondent believes that Petitioner has exhausted his state-court remedies as to the claims raised and that the petition is neither barred by the statute of limitations nor subject to the successive-petition bar. Resp't's Answer 4–5 , ECF No. 8.

## IV.  STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter,* 562 U.S. at 102.

---

[1]Because pages are inserted into the form petition, the pagination in the ECF header is used.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut the presumption of correctness through clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Furthermore, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* --- U.S. ---, 138 S. Ct. 1188, 1191–92 (2018).

## V. DISCUSSION

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393–95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington,* under which a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668,

688–89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits under the *Strickland* standard and denied by the state courts, federal habeas relief will be granted only if the state courts' determination involved an unreasonable application of *Strickland* in light of the state-court record, a substantially higher threshold. *Richter,* 562 U.S. at 100–01 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)); *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Petitioner raised his ineffective-assistance claims in his state habeas application, which the state habeas judge referred to a magistrate judge for resolution of the issues and preparation and entry of findings of fact and conclusions of law. SHR,[2] vol. 1, 75, ECF No. 10-31. After two evidentiary hearings, the magistrate judge entered the following relevant factual findings, which although numerous are included to assist the reader:

## II.  The Jury Trial

### A.  The State's Evidence

5.     [Petitioner] was driving a car in the parking lot of the Lincoln Square shopping center in Arlington, around 2:00 a.m. when several bars located in the shopping center were closing. His wife [Melissa Andrews] was a passenger in his car.

---

[2]"SHR" refers to the record of Petitioner's state habeas proceedings in WR-91,369-01.

4

6.  Dustin McGee was driving a car in the opposite direction, and he turned in front of [Petitioner]'s car so that his passenger, Terrance Jackson, was facing [Petitioner]'s car.

7.  Because McGee was turning slowly, [Petitioner] honked his horn at McGee, who stopped his car mid-turn.

8.  [Petitioner] got out of his car, came over to McGee's, and asked if the two men had a problem. When Jackson said "no," [Petitioner] got back in his car, and the two drivers proceeded out of the intersection.

9.  After turning left at the intersection, McGee made a U-turn, then turned right at the same intersection so that he was heading the same direction as [Petitioner].

10.  McGee then drove in the opposite lane around a line of cars so that he was parallel to [Petitioner]'s car.

11.  According to Jackson, McGee pulled his car into a parking spot to the right, and [Petitioner] pulled in about two spaces to the right of McGee's car so that [Petitioner]'s driver's side was adjacent to the passenger side of McGee's car. But according to [Petitioner], McGee pulled his car in front of [Petitioner]'s, blocking his way.

12.  [Petitioner] and McGee got out of the cars and approached each other and that at some point, both Jackson and [Petitioner]'s wife got out of the cars.

13.  [Petitioner] and McGee had a brief physical altercation during which [Petitioner] stabbed McGee with a knife.

14.  On November 15, 2015, [Petitioner] was arrested, and a videotaped interview was conducted.

15.  [Petitioner] told police that McGee had hit him with a bat and was swinging at him again when [Petitioner] pulled out the knife to defend himself.

16.  McGee ended up in front of a bar called Sherlocks where a patron attempted to assist him by performing CPR. He later died.

17.  Using [Petitioner]'s videotaped statement to the detectives, defense counsel argued that McGee and Jackson provoked the confrontation and that when they blocked him and jumped out of their car, McGee "swinging a bat," [Petitioner] felt he was under attack.  Despite that, counsel argued that

5

[Petitioner] did not intend to kill anyone.

. . .

**B.     Evidence and Arguments at the Punishment Phase**

19.     During the punishment phase of the trial, [Petitioner] testified on his own behalf.

20.     [Petitioner] testified that at the time of the crime, he was having an affair with Rosa Hernandez and that since that time, he had been divorced from Melissa Andrews and had married Hernandez.

21.     [Petitioner] testified that the truck he had been driving at the time of the crime had been parked at Rosa Hernandez's home, that she had sold it for him, and that its distinctive aftermarket rims were still in her home.

22.     [Petitioner] testified that the reason he had never worked is owing to his permanent disability, consisting of his bipolar disorder and schizophrenia.

23.     [Petitioner] listed the medications he was taking, including Haldol for schizophrenia.

24.     [Petitioner] acknowledged a criminal history of domestic assaults but explained that many of the incidents stemmed from periods when he was not receiving his medications.

25.     Trial counsel called Rosa Hernandez's brother to give character evidence on behalf of [Petitioner].

26.     [Petitioner] did not "rehash" the crime but declared that McGee "would still be with us today if it wasn't for Terrance" and maintained that McGee instigated the incident by "blocking [him] off," and by striking him with a bat.

27.     [Petitioner] testified that when McGee struck him with a bat, he had acted in self-defense and defense of his wife.

28.     In its closing arguments, the State did not cite [Petitioner]'s mental illness as an aggravating factor.

. . .

6

### III.  The Hearing Held on the Writ Application

31.     At the hearing conducted on December 3 and 21, 2020 upon this writ application, the Court took judicial notice of the Clerk's Record and the Reporter's Record of the trial, as well as the trial exhibits.

32.     Specifically, the Court took judicial notice of Court's Exhibit 1, the unredacted version of [Petitioner]'s videotaped statement, and State's Exhibit 31, the version that was admitted in [Petitioner]'s trial, from which references to [Petitioner]'s criminal and mental health history had been redacted.

33.     Testimony was received from [Petitioner], psychologist David Sabine, and trial counsel Scottie Allen; the Court found all three witnesses generally truthful, and credible except as otherwise described herein.

34.     [Petitioner] offered all the appendices that had been submitted in support of his application into evidence as hearing Exhibits 1 through 13.

        . . .

### A.     [Petitioner]'s History of Mental Illness

38.     [Petitioner] had a history of schizophrenia that included hearing voices.

39.     Schizophrenia or schizoaffective disorder may present "positive symptoms," such as hallucinations, hearing voices, or seeing things that are not there, and "negative symptoms," such as difficulty in personal relationships, withdrawal from life, or substance abuse.

40.     Over the years, Haldol had been effective in addressing [Petitioner]'s positive symptoms; when [Petitioner] was medicated with Haldol, he was stable and did not suffer from hearing voices.

41.     When [Petitioner]'s medication was changed, he decompensated, began hearing voices, became more paranoid, became violent and suicidal, and engaged in self-harm; resuming Haldol resolved those symptoms.

42.     [Petitioner] also took BuSpar to address his anxiety and mood symptoms.

43.     Even when properly medicated, [Petitioner]'s mental illness caused him to be anxious in stressful situations; as a result, he may have had a reduced ability to cope with stressful situations.

**B.    [Petitioner]'s Mental State at the Time of the Offense and Arrest**

44.    In November 2015, [Petitioner] had been taking the Haldol prescribed for his schizophrenia.

45.    [Petitioner] took the Haldol every morning and every evening in the days leading up to and including November 7, 2015.

46.    [Petitioner] felt the encounter with McGee was a stressful situation.

47.    When interviewed by detectives upon his arrest on November 15, 2015:

　　　　a.    [Petitioner] told them he was taking Haldol every day and that it helps him.

　　　　b.    [Petitioner] told the officers that he had been in and out of jail until he began taking his medication.

　　　　c.    "[Petitioner] used the interview as an opportunity to put forward his claim that the deceased had instigated the confrontation and attacked him."

　　　　d.    "Throughout the interview, [Petitioner] appear[ed] lucid and appropriately responsive to the officers' questions."

48.    When interviewed on December 22, 2015, by MHMR Forensic Mental Health Sarah Strebeck, [Petitioner] reported that he had been compliant with his medication.

49.    When interviewed on December 22, 2015, by Dr. Strebeck, [Petitioner] "discussed at length the events surrounding the altercation resulting in the death that [] led to the current charges of murder against him.  He did not appear overtly paranoid, delusional or disorganized during this discussion."

**C.    Scottie Allen's Representation.**

50.    Scottie Allen's practice focuses on first-degree felonies, and murder in particular; he has tried "dozens of murder cases."

51.    Allen has, in other past cases, called an expert as a trial witness as to the mental state of the defendant at the time of the offense.

**1.  Counsel's Performance During Pretrial Preparation**

8

52.   After [Petitioner]'s arrest on or about November 15, 2015, he was continually incarcerated until his trial and conviction.

53.   Shortly after [Petitioner]'s arrest, Scottie Allen was hired by [Petitioner]'s family and met with [Petitioner]'s sister and wife.

54.   During his meeting with [Petitioner]'s family, they informed him of [Petitioner]'s history of mental illness, including bipolar disorder and schizophrenia.

55.   Either at that meeting or "early on in [Allen's] representation," [Petitioner]'s wife provided Allen with some of [Petitioner]'s mental health records for his review; the records reflected [Petitioner]'s diagnosis of schizophrenia.

56.   On or around November 24, 2015, Allen met and consulted with [Petitioner] in the Tarrant County Jail.

57.   During their initial meeting, Allen and [Petitioner] discussed [Petitioner]'s mental health history, diagnoses of schizophrenia and bipolar disorder, and the medications he was taking.

58.   [Petitioner] informed Allen that he suffered symptoms of seizures, hearing voices, and having anxiety attacks.

59.   [Petitioner] informed Allen that he was medicated with Haldol, Tegretol, Artane, BuSpar, and clozapine.

60.   [Petitioner] informed Allen that he had been regularly taking his medication, including Haldol for schizophrenia; [Petitioner] had been taking Haldol every morning and every evening in the days leading up to and including November 7, 2015.

61.   As is his practice for any client with a history of mental illness, Allen ensured [Petitioner]'s competence to communicate with him, and he explained to [Petitioner] the charges to ensure [Petitioner] understood the law and the allegation against him.

62.   In their initial meeting, [Petitioner] displayed no signs of delusional thinking.

63.   In their initial meeting, [Petitioner] displayed no paranoia toward Allen.

64.   At that initial meeting, [Petitioner] gave Allen a detailed description of what happened on the night of the offense.

9

65.    [Petitioner] explained to Allen that McGee had struck him with a bat.

66.    Allen informed [Petitioner] that "this is straight cut self-defense."

67.    Allen believed a trial strategy of self-defense was viable in light of [Petitioner]'s statements that McGee confronted him and struck him with a bat, and the fact that [Petitioner] inflicted only a single knife wound.

68.    Allen and [Petitioner] discussed the potential defense of insanity at length.

69.    Allen talked to [Petitioner] about whether they were going to employ experts or call any of his doctors as witnesses, and how that would mix into their strategy for the case.

70.    Allen explained to [Petitioner] the strategic concerns involved in calling an expert witness: the State is entitled to cross-examination; the State would be privy to the experts' reports; and those reports can be mitigating, but "can also be aggravating in cases like this".

71.    In Allen's experience, where a defendant has been accused of a violent offense, juries are "more inclined to give a more stringent or stiffer sentence" if an expert testifies that, because of his mental illness, the defendant may be delusional, and may pose some future danger to either himself or citizens at large.

72.    Based on what [Petitioner] told him about the night of the offense, Allen did not believe an insanity defense was viable.

73.    [Petitioner] never expressed to Allen any lack of understanding regarding whether his actions were right or wrong.

74.    [Petitioner]'s descriptions of the stabbing never suggested to Allen that [Petitioner] had been delusional at that time.

75.    [Petitioner] agreed with Allen's determination that self-defense would be the defense employed in the case and that experts would not be in his best interest.

76.    Because Allen did not believe an insanity defense was viable in this case in light of his conversation with [Petitioner], Allen did not seek out all of [Petitioner]'s mental health records.

77.    Allen reviewed the videotaped interview between [Petitioner] and the detectives.

78.    [Petitioner]'s description of the offense in the videotaped interview was consistent with what [Petitioner] had said to Allen.

79.    Between November 2015 and February 2017, Allen met with [Petitioner] and spoke privately with him on every court date.

80.    During their consultations, Allen went over with [Petitioner] what his potential testimony might be.

81.    Allen never experienced any difficulty communicating with [Petitioner].

82.    Before trial in February 2017, Allen returned to the Tarrant County Jail to go over the pretrial discovery.

83.    After the pretrial hearing, Allen talked to [Petitioner] in "the holdover" regarding how the case would proceed; Allen waited for the holdover to be empty of other inmates so that they could speak privately.

### 2.  Counsel's Performance During Trial – Guilt/Innocence Phase

84.    At trial, Allen pursued a strategy of self-defense which conceded [Petitioner] had used a knife but disputed that he intended to cause death.

85.    Allen understood that the jury in this case would be instructed that a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.

86.    Allen understood that the jury in this case would be instructed that a person is justified in using deadly physical force when the actor reasonably believes that such force is immediately necessary to protect himself against another person's use or attempted use of unlawful deadly force.

87.    Allen understood that the jury in this case would be instructed that "reasonable belief" means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor.

88.    Allen's trial strategy had two goals: to show that [Petitioner]'s use of a knife was a reasonable use of force in response to the victim's use of a bat, and to negate the evidence that [Petitioner] intended to kill; those two goals were

11

consistent with one another.

89.     Allen's overall trial strategy was to portray [Petitioner] as an ordinary man with whom the jury could identify, who had been out with his wife to celebrate her birthday when he was confronted by two "thugs."

90.     As part of that strategy, Allen ensured that the State redacted from the videotaped interview entered as State's Exhibit 31 [Petitioner]'s statements revealing his criminal history and that he suffers from schizophrenia.

91.     The court charged the jury on one count of murder and two counts of aggravated assault.

92.     The jury's verdict of guilty as to aggravated assault and not guilty as to murder demonstrates a finding that [Petitioner] intended to cause serious physical injury but did not intend to kill McGee.

### 3.  Counsel's Performance During Trial – Punishment Phase

93.     During trial, Allen and [Petitioner] repeatedly discussed [Petitioner]'s potential testimony.

94.     [Petitioner] testified in the punishment phase over Allen's advice.

95.     Allen's strategy in the punishment phase had been to build on the jury's apparent acceptance of the defense theories he had established during the guilt/innocence phase of trial.

96.     [Petitioner]'s testimony contradicted Allen's sympathetic portrayal of him during guilt/innocence phase of trial; specifically:

    a.     [Petitioner] testified that at the time of the crime, he was having an affair with Rosa Hernandez and that since that time, he had been divorced from Melissa Andrews and had married Hernandez.

    b.     [Petitioner] testified that the reason he had never worked was owing to his permanent disability, consisting of his bipolar disorder and schizophrenia.

    c.     [Petitioner] listed the medications he was taking, including Haldol for schizophrenia.

    d.    [Petitioner] acknowledged a criminal history of domestic assaults but explained that many of the incidents stemmed from periods when he was not receiving his medications.

97.    Allen watched the jury's faces during [Petitioner]'s testimony and saw them visibly respond to his testimony, with their demeanor toward him becoming more negative.

98.    With regard to the stabbing, [Petitioner] maintained that he acted in self-defense.

99.    [Petitioner] did not testify at punishment that any mental illness contributed to his assault on McGee.

**C.    David Sabine's Opinion That Evidence of Mental Illness Would Have Resulted in a More Favorable Outcome to the Trial**

100.    David Sabine, PhD, interviewed [Petitioner] on December 5, 2019.

101.    Dr. Sabine had testified in approximately 40 criminal trials; in some cases, he was present at the trial only for his own testimony; he had never observed an entire criminal trial.

102.    Dr. Sabine had not watched the videotaped interview [Petitioner] gave to the police upon arrest before interviewing [Petitioner], nor did he watch the videotaped interview before forming the opinions he wrote in his report.

103.    Dr. Sabine understood from speaking to [Petitioner] and reading portions of the trial transcripts that the videotaped interview was admitted into evidence during the guilt/innocence phase of trial and that through it, the jury learned [Petitioner] suffered from schizophrenia.

104.    Based on Dr. Sabine's understanding that the jury learned that [Petitioner] suffered from schizophrenia through the videotape, Dr. Sabine believed they were left to form their own conclusions regarding [Petitioner]'s mental illness; Dr. Sabine formed the opinion that defense counsel should have called an expert to fully explain schizophrenia.

105.    Dr. Sabine believed the jury was left with a minimized view of [Petitioner]'s mental illness, that merely hearing the word "schizophrenia" may not have been sufficient to alert them to its relevance to the case, and that an expert should have been called to explain the nature and severity of [Petitioner]'s mental illness.

106.    The videotape was redacted. Those aspects of Dr. Sabine's opinion which rest on his misunderstanding that it was not redacted are unsupported by the record.

107.    Regardless of whether the jury learned [Petitioner] suffered from mental illness through the videotape, Dr. Sabine's opinion is that the jury needed information regarding [Petitioner]'s mental illness to understand the circumstances of this particular defendant.

108.    Dr. Sabine opined that [Petitioner] may have suffered from paranoia which "influenced his perception and behavior" at the time of the confrontation with the two men such that he "overestimated the threat they represented."

109.    Although [Petitioner] did not give Dr. Sabine any indication that he suffered from paranoia during the offense, [Petitioner]'s descriptions of his feelings at the time of the offense "seemed consistent with that kind of decompensation."

110.    [Petitioner] had not been diagnosed with paranoia as a subtype of his schizophrenia; he had never been diagnosed with paranoid personality disorder.

111.    Per Dr. Sabine, paranoia is an unrealistic, exaggerated belief that others are hostile, and that the person is at risk.

112.    Paranoia's unique feature is a feeling that "I'm at risk" or "I'm in danger" "in the absence of a legitimate threat that's equal to the feel[ing]."

113.    In most cases of true paranoia, the person believes his or her perception is accurate and is not cognizant of the paranoia.

114.    Dr. Sabine opined that [Petitioner] may have been hypervigilant owing to the time he had spent in prison, and as a result, would have reacted to the confrontation in the parking lot differently from a person who had not been incarcerated and who did not suffer from schizoaffective disorder.

115.    In order for a defense expert at the guilt/innocence phase of [Petitioner]'s trial to have established that [Petitioner] suffered from hypervigilance, the jury would have had to be informed of [Petitioner]'s extensive criminal history and the disciplinary matters he had experienced while in prison, particularly those involving assaults.

116.    An ordinary person will have a low-level awareness of surroundings and the

14

possibility of bad things happening and, when presented with evidence of bad things happening, will become attuned to that aspect of the environment[.]

117.   In contrast to an ordinary person, someone who is hypervigilant is "always on"; hypervigilance is a person's belief that from any quadrant, at any time, bad things could happen to the person.

118.   Dr. Sabine opined that [Petitioner], owing to his schizoaffective disorder and hypervigilance, lacked an ordinary person's ability to cope with a stressful situation and would automatically perceive the confrontation with McGee as a perilous situation requiring him to defend himself.

119.   Dr. Sabine believed that the victim, McGee, was accompanied by two or more men and based on that, [Petitioner] may have felt threatened.

120.   The sole source of Dr. Sabine's belief that McGee was accompanied by multiple men is the testimonies of [Petitioner], Terrance Jackson, and Melissa Andrews; their testimonies reflect only one other man with McGee, and therefore, that aspect of Dr. Sabine's opinion is not supported by the record.

121.   In Dr. Sabine's opinion, after [Petitioner] testified during punishment phase regarding his mental illness, the jury was left with a minimized view of his mental illness; defense counsel should have called an expert to explain its nature and severity.

**D.   Scottie Allen's Opinions Regarding Whether Evidence of Mental Illness Would Have Resulted in a More Favorable Outcome to the Trial.**

122.   In Allen's opinion, the self-defense strategy he followed was successful in achieving a not-guilty verdict on the charge of murder.

123.   In Allen's opinion, the jury's verdict demonstrated that they had accepted the defense theory which portrayed [Petitioner] as an ordinary man who had reacted reasonably when confronted with a threat.

124.   In Allen's opinion, the jury's verdict demonstrated that they had not found the proof of intent to kill beyond a reasonable doubt.

125.   In Allen's opinion, the jury's acceptance of the defense theories was reversed during [Petitioner]'s testimony at the punishment phase and that if he had not testified, the sentence would have been more favorable.

126.   In Allen's opinion, evidence showing [Petitioner] was paranoid at the time

15

of the offense would have hurt his effort to portray [Petitioner] as an ordinary, prudent person.

127.    In Allen's opinion, evidence that [Petitioner] suffered from paranoia, as defined by "an unrealistic fear, an unfounded fear" would not have supported his trial effort to satisfy the legal definition of self-defense.

128.    Had Allen consulted with a psychologist before trial who opined that, owing to [Petitioner]'s extensive time incarcerated and the fights he had had in prison, [Petitioner] suffered from "hypervigilance" meaning "lacking an ordinary person's ability to cope with confrontation," Allen would not have called such an expert as a witness at trial because such an expert's opinion would have been hurtful, not helpful, in proving self-defense.

129.    In Allen's opinion, evidence that showed [Petitioner]'s response to the victim's threat was an overreaction to that threat or based on [Petitioner]'s misperception of a threat would have been counter to his self-defense strategy at trial.

130.    In Allen's experience, juries that hear evidence that the defendant, because of mental illness, may pose a future danger to society, tend to give "more stringent or stiffer" sentences than they would if they had not heard that evidence.

Suppl. SHR 252–67, ECF No. 10-30 (citations omitted).

Based on those findings, and applying the *Strickland* standard, the magistrate judge entered

the following relevant legal conclusions:

**[Petitioner] Has Failed to Sustain His Burden of Showing Ineffective Assistance of Counsel in the Punishment Phase of Trial.**

14.    [Petitioner] has failed to show that counsel's decision not to offer evidence of [Petitioner]'s mental illness during the punishment phase fell below an objective standard of reasonableness.

15.    Allen's opinion that [Petitioner]'s mental illness was not legally relevant to his culpability was reasonable and well-founded on his review of [Petitioner]'s videotaped interview with detectives approximately a week after the offense and his own interview of [Petitioner] less than three weeks after the offense.

16

16.     Dr. Sabine's opinion that [Petitioner]'s mental illness was relevant to his culpability is given less weight than Mr. Allen's opinion, based as it is on an interview with [Petitioner] years after the offense, and without the aid of ever viewing the videotaped interview with detectives.

17.     Allen's opinion that evidence of mental illness poses the risk of increasing the jury's perception of the defendant as dangerous leading them to impose a harsher sentence is well-founded on his extensive experience trying criminal cases, particularly murder cases.

18.     As Dr. Sabine's report correctly observes, "the stigma regarding mental illness endemic in our culture tends to predispose the average juror to overestimate the risk for violence inherent in the person with serious and prolonged mental illness."

19.     Evidence of chronic mental illness falls within evidence that operates as a "two-edged sword" because it tends both to lessen culpability for the crime and to confirm the State's evidence of future dangerousness.

20.     [Petitioner] has failed to establish that additional testimony at the punishment phase that [Petitioner] suffered from schizoaffective disorder combined with bipolar disorder, "a serious and prolonged mental illness," in which "[c]ycles of severe symptoms are followed by periods of improvement," . . . would have:

        a. lessened his culpability for the crime, or

        b. reduced the jurors' estimation of [Petitioner]'s dangerousness to the community.

21.     [Petitioner] has failed to establish that [Petitioner] actually experienced paranoia or hypervigilance at the time of the offense.

22.     Dr. Sabine's opinion that [Petitioner] "may" or "could" have experienced paranoia or hypervigilance at the time of the offense is both insufficient to establish [Petitioner] actually experienced those symptoms and contradicted by the other record evidence, including:

        a.     [Petitioner]'s statements in the videotaped interview with detectives on November 15, 2015;

        b.     [Petitioner]'s description of the offense to Scottie Allen on or about November 24, 2015; and

      c.    [Petitioner]'s description of the offense to Dr. Strebeck on December 22, 2015.

23.    [Petitioner] has failed to establish that evidence was available to Allen to show that [Petitioner] experienced paranoia or hypervigilance at the time of the offense.

24.    [Petitioner] has failed to establish that evidence during punishment which tended to show [Petitioner] suffered from paranoia, marked by unfounded feelings of being in danger in the absence of a legitimate threat, would have lessened [Petitioner]'s culpability for this crime or reduced the jurors' estimation of [Petitioner]'s dangerousness to the community.

25.    [Petitioner] has failed to establish that testimony at the punishment phase to the effect that he suffered hypervigilance from his years of incarceration such that he automatically viewed McGee as a threat requiring him to defend himself . . . would have lessened [Petitioner]'s culpability for this crime or reduced the jurors' estimation of [Petitioner]'s dangerousness to the community.

26.    Counsel's decision not to offer testimony from an expert regarding the extent and severity of [Petitioner]'s mental illness during punishment is consistent with the performance of a reasonably competent attorney.

27.    Because counsel's decision not to call an expert as to [Petitioner]'s mental illness at the punishment phase of trial was reasonable, counsel's related decision that he need not obtain additional records of [Petitioner]'s mental health was also reasonable.

28.    [Petitioner] has failed to establish subpar performance by counsel during the punishment phase of trial.

29.    [Petitioner] has failed to show that a reasonable likelihood exists that the jury's sentence would have been more favorable had trial counsel presented evidence of his mental illness in the punishment phase of trial.

. . .

**[Petitioner] Has Failed to Sustain His Burden of Showing His Attorney Provided Ineffective Assistance of Counsel in the Guilt/Innocence Phase of Trial.**

31.     Dr. Sabine's opinion that the jury should have been allowed to consider [Petitioner]'s mental health at the guilt/innocence phase of trial is given little weight, because it is based in part on a misunderstanding of the facts of the case; specifically:

      a.     Dr. Sabine's opinion is based in part on the testimony of witnesses "that there were other men with Mr. McGee who, simply by their number, likely made [Petitioner] feel threatened"; the evidence at trial proved that Dustin McGee and Terrance Jackson were the only two men involved in the altercation with [Petitioner].

      b.     Dr. Sabine's opinion is based in part on his misunderstanding that the jury was shown the unredacted version of [Petitioner]'s interview with detectives and therefore learned that [Petitioner] suffered from schizophrenia at the guilt/innocence phase of trial; the videotape was redacted to omit those revelations.

32.     Dr. Sabine's opinion that the jury should have been allowed to consider [Petitioner]'s mental health at the guilt/innocence phase of trial is given little weight, because it is based in part on a mistaken understanding of the law, that is, Dr. Sabine's apparent view that a defendant's trial strategy may consist of a hybrid defense of self-defense and mental illness.

33.     In Texas, it is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

34.     Texas's self-defense statutes permit the use of force only when and to the degree a person "reasonably believes" it to be "immediately necessary."

35.     Texas law precluded Allen from pursuing a trial strategy that included both mental illness and self-defense, since a "'reasonable belief' is one that would be held by an ordinary and prudent person, not by a paranoid psychotic."

36.     Evidence of mental illness, which "only tend[s] to show that possibly [Petitioner] was not an ordinary and prudent man with respect to self-defense," would not entitle [Petitioner] "to an enlargement of the statutory defense on account of his psychological peculiarities."

37.     Counsel's decision to forego an insanity defense was reasonably based on [Petitioner]'s description of the offense which showed no sign of delusional

thinking or lack of comprehension regarding whether his conduct was right or wrong.

38. Counsel's strategic decision not to pursue an insanity defense was a reasonably informed one in light of the findings of fact set forth above that:

    a. Counsel was aware of [Petitioner]'s diagnosis with schizophrenia;

    b. Counsel considered the possibility of the insanity defense;

    c. Counsel reviewed the circumstances of the offense as described by [Petitioner];

    d. Counsel reviewed [Petitioner]'s videotaped interview by detectives; and

    e. Counsel reviewed some mental health records supplied by [Petitioner]'s family.

39. The record demonstrates that counsel consistently pursued the trial strategy of self-defense combined with an effort to negate the evidence of [Petitioner]'s intent to kill.

40. Counsel's strategy was plausible in light of [Petitioner]'s statements to Mr. Allen and in the videotaped interview that McGee confronted him and struck him with a bat, and the fact that [Petitioner]'s response was a single knife wound.

41. Through trial counsel's strategy, the jury acquitted [Petitioner] of the top count of murder.

42. Testimony from an expert tending to show that [Petitioner], at the time of the offense, was not acting as an ordinary and prudent person as a result of schizoaffective disorder, paranoia, and/or hypervigilance would have undermined the trial strategy actually pursued.

43. Testimony from an expert that, owing to [Petitioner]'s schizoaffective disorder and the hypervigilance that resulted from his extended incarcerations, [Petitioner] would have mistakenly perceived the confrontation with McGee as a perilous situation requiring him to defend himself would have undermined the trial strategy actually pursued.

44.    Counsel's omission to call an expert at trial to establish [Petitioner]'s schizoaffective disorder, paranoia, and/or hypervigilance is consistent with the performance of a reasonably competent attorney.

45.    Because counsel's decision not to call an expert as to [Petitioner]'s mental illness at the guilt/innocence phase of trial was reasonable, counsel's related decision that he did not need to review additional records of [Petitioner]'s mental health was also reasonable.

. . .

47.    [Petitioner] has failed to show that a reasonable likelihood exists that the jury's verdict would have been more favorable had trial counsel presented evidence of his mental illness . . . in the guilt/innocence phase of trial.

48.    Because the outcome of the trial would have been no better had counsel taken the omitted actions described by the writ application, [Petitioner] suffered no prejudice.

Suppl. SHR 267–75, ECF No. 10-30 (citations omitted).

The magistrate judge's findings and conclusions were subsequently adopted by the trial judge, who had presided over the trial proceedings, and the Texas Court of Criminal Appeals denied relief based on the trial court's findings. *Id.* at 301; Action Taken 10-20. Petitioner presents no evidence or persuasive argument to rebut the state court's findings. Therefore, relying on the presumptive correctness of those findings, and having independently reviewed Petitioner's ineffective-assistance claims in conjunction with the state court records, the state court's application of *Strickland* was not objectively unreasonable under the doubly-deferential standard applied to such claims.

The *Strickland* standard is highly deferential to strategic choices made by trial counsel. "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance." *Cotton*

*v. Cockrell,* 343 F.3d 746, 752 (5th Cir. 2003). A "conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman,* 566 F.3d 553, 564 (5th Cir. 2009) (internal quotations and citations omitted). Although counsel may not have fully explored Petitioner's mental illness, *Strickland* does not require counsel to fully investigate all mitigating evidence. *See Martinez v. Quarterman,* 481 F.3d 249, 254 (5th Cir. 2007). Counsel developed a reasonable trial strategy, which reasonably supported limitations on his investigation of Petitioner's mental illness as it would have undermined the chosen strategy. We may not, in hindsight, second-guess counsel's strategy because an alternative course of action existed during trial. *Green v. Johnson,* 116 F.3d 115, 1122 (5th Cir. 1997). The record contains sufficient evidence to demonstrate that counsel's decision not to further investigate, develop, and present expert testimony as to Petitioner's mental illness during the guilt/innocence phase of his trial resulted from an informed trial strategy and fell within the wide range of trial tactics that constitute reasonable assistance. *Richards,* 566 F.3d at 564.

Nor did Petitioner demonstrate that his sentence would have been significantly less harsh had counsel further investigated, developed, and presented expert testimony as to his mental illness, which could be both mitigating and aggravating as Dr. Sabine's opinions epitomize. Indeed, the Fifth Circuit counsels deference to strategic decisions not to present such double-edged mitigation evidence. *See Martinez v. Quarterman,* 481 F.3d 249, 254–55 (5th Cir. 2007); *Foster v. Johnson,* 293 F.3d 766, 778–79 (5th Cir. 2002); *Lamb v. Johnson,* 179 F.3d 352, 358 (5th Cir. 1999); *Rector v. Johnson,* 120 F.3d 551, 564 (5th Cir. 1997); *Boyle v. Johnson,* 93 F.3d 180 (5th Cir. 1996); *Mann v. Scott,* 41 F.3d 968, 984 (5th Cir. 1994).

## VI.  CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, for the reasons discussed, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 20th day of July, 2021.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**